UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| WILLIAM CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:05-CV-360 |
| | ) | (VARLAN/SHIRLEY) |
| R. C. BABAOGLU, individually, | ) | |
| CAS CLARK, individually, | ) | |
| and KNOX COUNTY, TENNESSEE, | ) | |
| a political subdivision of the State of Tennessee, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This civil rights action is before the Court on defendant Knox County's Motion for Summary Judgment [Doc. 25] and defendant Babaoglu and defendant Clark's Motion for Summary Judgment [Doc. 28]. Plaintiff William Campbell ("Plaintiff") opposes defendants' motions. [Docs. 34, 43].

The Court has carefully considered the pending motions, along with the parties' briefs, affidavits, and other relevant pleadings. For the reasons set forth herein, defendant Knox County's motion for summary judgment [Doc. 25] will be **GRANTED** and defendant Babaoglu and defendant Clark's motion for summary judgment [Doc. 28] will be **GRANTED in part** and **DENIED in part**.

## I. Relevant Facts

As the Court is required to do in reviewing a motion for summary judgment, all facts will be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Plaintiff's amended complaint [Doc. 14] alleges violations of 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments of the Constitution. On the evening of October 23, 2004, Plaintiff and his wife, Mary Campbell ("Mrs. Campbell"), began arguing in their home. [Doc. 36, Attachment 2 at p. 27]. After arguing for approximately thirty minutes, Mrs. Campbell called 911. [*Id*. at pp. 17, 27]. While Mrs. Campbell was speaking to the 911 operator, Alicia Campbell, the daughter of Plaintiff and Mrs. Campbell, took the phone and hung it up. [*Id*. at p. 27]. The 911 operator then called the Campbell household and Mrs. Campbell answered on a cordless phone. [*Id*.; Doc. 27, Ex. 3].

Mrs. Campbell asked the 911 operator to have the police come and either remove Plaintiff from the house or to escort Mrs. Campbell from the house. [Doc. 27, Ex. 3; Doc. 36, Attachment 2 at p.2]. Mrs. Campbell informed the 911 operator that Plaintiff had been drinking. [Doc. 27, Ex. 3; Doc. 36, Attachment 2 at p.2]. Mrs. Campbell also told the 911 operator that Plaintiff had been "manhandling" Mrs. Campbell and her daughter and wouldn't let Mrs. Campbell get to the phone. [Doc. 27, Ex. 3; Doc. 36, Attachment 2 at p.2]. Mrs. Campbell also indicated that Plaintiff is a white male and that Plaintiff did not have any weapons. [Doc. 27, Ex. 3]. Alicia Campbell could be heard crying in the background of the 911 tape, at which point the 911 operator asked if Alicia Campbell was "ok," but received

no response. [Doc. 27, Ex. 3; Doc. 36, Attachment 2 at p. 2]. Mrs. Campbell informed the 911 operator that she just wanted to get away from the house so she could "get some peace." [Doc. 27, Ex. 3].

Mrs. Campbell asked to remain on the line with the 911 operator while she waited for the police. [*Id.*]. Mrs. Campbell then told the 911 operator that Plaintiff would not hurt Alicia Campbell, that Alicia Campbell would be fine in the house, but that Mrs. Campbell just wanted to go. [*Id.*]. Mrs. Campbell stated that "this," presumably arguments between Plaintiff and Mrs. Campbell, had been "going on and off for the thirty-seven years" Plaintiff and Mrs. Campbell had been married. [*Id.*]. Mrs. Campbell stated that she "had tried to endure it, but [she] just [didn't] think she [could] any more." [*Id.*]. Mrs. Campbell told the 911 operator that Plaintiff "is a mean drunk when he gets drunk." [*Id.*]. Mrs. Campbell reiterated that she wanted to be escorted somewhere so that she could get some rest. [*Id.*].

Plaintiff then began speaking to Mrs. Campbell, at which point Mrs. Campbell asked the 911 operator when the police would arrive. [*Id.*]. The 911 operator did not have an estimated arrival time for the officers, but assured Mrs. Campbell that they would be there as soon as they could. [*Id.*]. Plaintiff then asked Mrs. Campbell whom she was talking to; Mrs. Campbell stated that she was speaking to a 911 operator. [*Id.*]. Mrs. Campbell then informed the 911 operator that she was trying to start her car so she could leave. [*Id.*]. At that point the phone call and the 911 recording end, either because the cordless phone lost its connection or because someone hung up. [*Id.*; Doc. 36, Attachment 2 at p. 30].

3

After the phone call to 911 terminated, Mrs. Campbell handed the cordless phone to Alicia Campbell, asked Alicia to tell the 911 operator to have the police not come, and then drove away. [Doc. 36, Attachment 2 at p. 30]. However, the 911 call ended before Alicia Campbell could relay that information, so the 911 operator did not know that Mrs. Campbell had left the Campbell house and no longer wanted the police to come. [Doc. 27, Ex. 3; Doc. 36, Attachment 2 at p. 30].

Plaintiff and Alicia Campbell then went back inside the Campbell home. [Doc. 36, Attachment 2 at p. 5]. Plaintiff and Alicia Campbell had been inside for approximately one minute when they heard a knock at the door. [*Id.*]. Alicia Campbell looked through the peephole, then opened the door slightly. [*Id.*]. Two police officers, defendants Babaoglu and Clark, were at the door. [*Id.*]. Plaintiff was behind and to the left of Alicia Campbell at this point, so the officers could not see all of Plaintiff's body, nor could they tell if Plaintiff was armed. [*Id.*]. The officers stated that they were responding to a report of a domestic disturbance. [*Id.*]. Alicia Campbell then told the officers that Mrs. Campbell had made the call, but that Mrs. Campbell had left the home. [*Id.* at p. 27]. Alicia Campbell next told the officers that only she and Plaintiff were on the premises. [*Id.*].

The officers then pushed the door open, entered the Campbell home without permission, and one of the officers shined a flashlight in Plaintiff's face. [*Id.* at 27-28]. Plaintiff had his hands in his pockets. [*Id.* at 4]. The officers asked Plaintiff to take his hands out of his pockets; Plaintiff complied, but soon placed his hands back in his pockets to pull his pants up. [*Id.*]. The officers asked Plaintiff two or three more times to take his

4

hands out of his pockets, with Plaintiff complying for a brief period before again placing his hands in his pockets. [*Id.*]. After asking Plaintiff three or four times to take his hands out of his pockets, the officers pushed Plaintiff against the wall of the foyer and then down onto the stairs. [*Id.*]. Plaintiff sustained a cut to his head during this incident. [*Id.* at p. 6]. Plaintiff was placed in handcuffs, but was not beaten, punched, or otherwise attacked. [*Id.*].

When the officers entered the house, Alicia Campbell called Mrs. Campbell's cell phone. [*Id.* at p. 18]. When the officers attempted to restrain Plaintiff, Alicia Campbell told Mrs. Campbell "Oh my God. They're killing my daddy. Oh my God. They're killing my daddy." [*Id.*]. Mrs. Campbell then turned her vehicle around and returned home. [*Id.*]. After Mrs. Campbell returned, defendant Clark approached Mrs. Campbell and prevented Mrs. Campbell from approaching Alicia Campbell or Plaintiff. [*Id.*]. At the same time, defendant Babaoglu escorted Plaintiff to Babaoglu's patrol car. [*Id.*]. Plaintiff then asked Mrs. Campbell if she had wanted this to happen. [*Id.*]. In response, defendant Babaoglu slammed Plaintiff's head into the back of Babaoglu's patrol car. [*Id.*].

At this point Mrs. Campbell started crying and told defendant Clark that she thought the 911 call had been cancelled and asked the officers not to take Plaintiff to jail. [*Id.*]. Mrs. Campbell also told Defendant Clark that "There's no reason to take him to jail. He's not assaulted me. He's not assaulted our daughter. There's no reason to do this." [*Id.*]. Defendant Babaoglu then took Plaintiff around to the side of Babaoglu's car, slammed Plaintiff's head into the top of the car, and then placed Plaintiff inside the car. [*Id.*]. Plaintiff was then driven to a nearby Wiegels, where he was inspected by paramedics. [*Id.* at p. 8].

5

Plaintiff was then taken to jail. [*Id.*]. Plaintiff was held overnight and then released on bond. [*Id*. at p. 23]. Approximately a month later the charges against Plaintiff were dismissed. [*Id*.].

## II. Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Id.* at 249. Thus, "[t]he inquiry performed is the threshold inquiry of

determining whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

**III. Analysis**

Plaintiff contends that defendants Babaoglu and Clark violated Plaintiff's constitutional rights by entering Plaintiff's home without permission, a warrant, or exigent circumstances, by using excessive force against Plaintiff, by unlawfully arresting Plaintiff without probable cause, and by depriving Plaintiff of the equal protection of the law, all in violation of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. Plaintiff further contends that defendant Knox County violated Plaintiff's constitutional rights because defendants Babaoglu and Clark were following the directives, policies, and training given to them by defendant Knox County.

The defendants seek summary judgment in their favor on multiple grounds, including that: (1) defendant Knox County did not directly violate Plaintiff's civil rights, nor were Plaintiff's alleged civil rights violations the results of any policy of Knox County; (2) there is no evidence that the alleged violation of Plaintiff's civil rights occurred because of inadequate training and supervision on the part of defendant Knox County; (3) defendants Babaoglu and Clark entered Plaintiff's home under exigent circumstances; (4) defendants Babaoglu and Clark had probable cause to arrest Plaintiff; (6) defendants Babaolgu and Clark did not use excessive force when arresting Plaintiff; and (7) even if defendants Babaoglu and Clark did violate Plaintiff's rights, they are entitled to qualified immunity.

7

**A.    42 U.S.C. § 1983**

42 U.S.C. § 1983 provides a civil cause of action when a citizen is subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of law.  It is well settled that § 1983 by its terms does not create any substantive rights but rather "merely provides remedies for deprivations of rights established elsewhere."  *Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Gardenhire v. Schubert,* 205 F.3d 303, 310 (6th Cir. 2000)).  To prevail on his § 1983 claims, Plaintiff "must establish that a person acting under color of state law deprived [Plaintiff] of a right secured by the Constitution or laws of the United States."  *Radvansky*, 395 F.3d at 302 (quoting *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001)).  In other words, Plaintiff must first show that he has suffered a violation of a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *McKinley v. City of Mansfield*, 404 F.3d 418, 429 (6th Cir. 2005).

**B.    Knox County**

Plaintiff contends that defendant Knox County violated Plaintiff's constitutional rights because defendants Babaoglu and Clark were following the directives, policies, and training given to them by defendant Knox County.  Defendant Knox County counters that it did not directly violate Plaintiff's civil rights, nor were Plaintiff's alleged civil rights violations the results of any policy of Knox County.  Knox County further argues that there is no evidence that the alleged violation of Plaintiff's civil rights occurred because of inadequate training and supervision on the part of Knox County.

In order to state a claim against a governmental entity under § 1983, Plaintiff must show that a policy or custom attributable to the governmental entity resulted in a violation of his constitutional rights. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). "A municipality may be liable under § 1983 for actions of its authorized policymakers 'where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Adair v. Charter County of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006). Furthermore, "the policymaker for whose conduct the plaintiff seeks to hold the municipality liable must possess final authority to create official policy with respect to the action ordered." *Id.* Additionally, because there is no *respondeat superior* liability under § 1983, *Searcy v. Dayton*, 38 F.3d 282, 286 (6th Cir. 1994), a governmental entity cannot be liable for an injury inflicted solely by its employees or agents. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

Inadequate training of officers may also serve as a basis for liability under § 1983, but "only where the failure to train amounts to deliberate indifference to the rights of individuals with whom the officers come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *Id*. at 389. The Sixth Circuit recognizes two situations in which a failure to train could be the result of deliberate indifference: first is the "failure to provide adequate training in light of foreseeable consequences that would result from the lack of instruction, as would be the case, for

example, if a municipality failed to instruct its officers in the use of deadly force"; second "is where the city fails to act in response to repeated complaints of constitutional violations by officers." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)

Finally, a failure to supervise can also serve as a basis for liability under § 1983, but only in limited circumstances. "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, 199 F.3d at 300 (internal quotation marks and citation omitted). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* However, it is not enough to merely point to a particular sort of training which, if provided, might have prevented the harm suffered in a given case. Rather, such liability attaches only if a constitutional violation is "part of a pattern" of misconduct, or "where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982). Only in such circumstances can it be said that a supervisor's liability rests upon "active unconstitutional behavior," as opposed to "a mere failure to act." *Shehee*, 199 F.3d at 300 (internal quotation marks and citation omitted).

The record shows that it is the policy of Knox County that "domestic violence incidents should be handled in accordance with [Tenn. Code Ann. §] 40-7-103(7)." [Doc. 36,

10

Attachment 2 at p. 42]. It is also Knox County's policy that an "[o]fficer's primary duties, when investigating domestic violence complaints, are to protect victims or potential victims of domestic violence, enforce the law, and make **lawful arrests** of offenders **when appropriate**." [*Id.* (emphasis added)]. Tenn. Code Ann. § 40-7-103(7) mandates that an officer may arrest a person without a warrant pursuant to Tenn. Code Ann. § 36-3-619.

Tenn. Code Ann. § 36-3-619 mandates that "[i]f a law enforcement officer has **probable cause** to believe that a person has committed a crime involving domestic abuse, whether the crime is a misdemeanor or felony, or was committed within or without the presence of the officer, **the preferred response of the officer is arrest**." *Id.* (emphasis added). Therefore, Knox County's policy with respect to domestic violence calls is that an officer follow the laws of Tennessee and only arrests a suspect when there is probable cause. Additionally, there is no evidence of record that it is the policy of Knox County to arrest individuals without probable cause, to use excessive force, nor to enter an individual's home in the absence of a warrant, permission, or exigent circumstances. Accordingly, there is no evidence to support a claim that it was Knox County's policies which resulted in Plaintiff's alleged civil rights violations.

With respect to the failure to train and supervise claims, Plaintiff contends that, with respect to domestic violence calls, Knox County officers are only trained for two situations: where the victim and assailant are both present and where only the victim is present. Plaintiff argues that the situation in the instant action clearly falls outside either of those situations, because in this instance only the alleged assailant and another witness were present, not the

alleged victim. Plaintiff argues that defendant Knox County's failure to prepare officers for the possibility that the victim might not be present represents a clear violation of Plaintiff's civil rights.

However, as noted above, the Sixth Circuit recognizes a failure to train claim only when there is either a failure to provide adequate training in light of foreseeable consequences that would result from the lack of instruction, or when a municipality fails to act in response to repeated complaints of constitutional violations by officers. Neither situation is present here.

It is true that Knox County's domestic violence policies spell out only the two situations Plaintiff has noted, but that same policy dictates that an individual is to be arrested only when there is probable cause. Additionally, Knox County's General Order 111 clearly mandates that officers shall not use excessive force, and also requires officers to maintain a working knowledge of all laws and regulations, which would include the laws regulating warrantless entry of a home. [Doc. 36, Attachment 2 at pp. 47, 52]. The record also shows that officers in Knox County receive training "in all aspects of their duties, including legal guidelines, citizens' rights, and constitutional obligations." [Doc. 27, Attachment 2 at p. 2]. Clearly, it would be impossible for regulations to predict every possible situation an officer might face while on duty, and it is the purpose of an officer's training to help guide the officers when responding to situations which might not have been anticipated. Nor is there any evidence of repeated complaints of constitutional violations to which Knox County has failed to respond.

Accordingly, the Court does not find that defendant Knox County has failed to properly train its police officers. Nor does the Court find that Knox County has failed to properly supervise its officers, as there has been no showing that the alleged police behavior in the instant action is part of a pattern of misconduct, nor that there has been a complete failure to train the police force, nor training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur. *Hays*, 668 F.2d at 874. Plaintiff also argues that Knox County's failure to conduct a proper internal investigation of Plaintiff's civil rights violations is further evidence of Knox County's failure to train and supervise its officers. However, this argument also fails because Plaintiff has no constitutional right to an internal investigation of police misconduct. *McGill v. Mountainside Police Dep't*, 720 F. Supp. 418, 422 (D.N.J. 1989) (citing *Rizzo v. Goode*, 423 U.S. 362 (1976)). Therefore, defendant Knox County's motion for summary judgment will be granted.

**C.     Defendants Babaoglu and Clark**

Plaintiff contends that defendants Babaoglu and Clark violated Plaintiff's constitutional rights by entering Plaintiff's home without permission, a warrant, or exigent circumstances, by unlawfully arresting Plaintiff without probable cause, by using excessive force against Plaintiff, and by depriving Plaintiff of the equal protection of the law, all in violation of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. Defendants Babaoglu and Clark counter that they entered Plaintiff's home under exigent circumstances; they had probable cause to arrest Plaintiff; they did not use excessive force

when arresting Plaintiff; and that even if they did violate Plaintiff's rights, they are entitled to qualified immunity. The Court will address each constitutional basis in turn.

1.     **Unlawful Entry**

The United States Supreme Court has held that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980). Generally, an officer must obtain a warrant based upon a judicial determination of probable cause to enter a home. *Id*. at 585-86. However, the law recognizes that an exception can be made in certain exigent circumstances, including hot pursuit of a fleeing felon; imminent destruction of evidence; the need to prevent a suspect's escape; and a risk of danger to the police or others. *Thacker v. Columbus*, 328 F.3d 244, 253 (6th Cir. 2003).

Plaintiff contends that there was no excuse for defendant's warrantless entry of Plaintiff's home. However, based upon the circumstances, it is clear that exigent circumstances existed. Defendants Babaoglu and Clark were responding to a domestic disturbance call. In calling 911, Mrs. Campbell clearly indicated that Plaintiff had been "manhandling" her. [Doc. 27, Ex. 3; Doc. 36, Attachment 2 at p.2]. Mrs. Campbell also made repeated requests that the police escort her out of the house. [Doc. 27, Ex. 3]. While it is true that Mrs. Campbell attempted to cancel her 911 call, that subsequent 911 call terminated before anyone could inform the 911 operator that the police were no longer needed and that Mrs. Campbell had left the premises. [*Id*.; Doc. 36, Attachment 2 at p. 30].

14

The Court finds that, when defendants Babaoglu and Clark arrived, they had no knowledge that Mrs. Campbell was not on the premises, and it was reasonable for them to assume that Mrs. Campbell might be inside Plaintiff's house and in need of help. Accordingly, exigent circumstances did exist, excusing the warrantless entry of Plaintiff's home by defendants Babaoglu and Clark. "Police have a right and a duty to respond to emergency situations." *Thacker*, 328 F.3d at 253. For this Court to hold otherwise would too greatly interfere with an officers' ability to carry out that duty. Therefore, the defendants' motion for summary judgment will be granted with respect to Plaintiff's § 1983 claim based upon defendants' unlawful entry of Plaintiff's home.

**2.    Unlawful Arrest**

"It is well established that any arrest without probable cause violates the Fourth Amendment." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003). "For a police officer to have probable cause for arrest, there must be facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id*. "Probable cause requires only the probability of criminal activity not some type of prima facie showing." *Id*. "The probability of criminal activity is assessed under a reasonableness standard based on an examination of all facts and circumstances within an officer's knowledge at the time of the arrest." *Id*. The Court looks "at this question through the lens of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir.

2005)(citation omitted). In a § 1983 action, the existence of probable cause is a jury question, unless there is only one reasonable determination possible. *Thacker*, 328 F.3d at 255.

Plaintiff was arrested for domestic assault in violation of Tenn. Code Ann. § 39-13-111. [Doc. 36, Attachment 2 at p. 37]. A person commits domestic assault when he intentionally, knowingly, or recklessly causes bodily injury to a family member; or intentionally or knowingly causes a family member to reasonably fear imminent bodily injury; or intentionally or knowingly causes physical contact with a family member and a reasonable person would regard the contact as extremely offensive or provocative. Tenn. Code Ann. §§ 39-13-101, -111.

Viewing the facts in favor of the Plaintiff, the Court cannot find that the only reasonable determination is that probable cause existed to arrest Plaintiff. The record shows that Mrs. Campbell had been able to leave her home without sustaining any injury, and she informed the officers that Plaintiff had not assaulted her. There are clearly genuine issues of material fact with respect to this claim, such as whether Plaintiff was drunk, what Alicia Campbell told the officers, what Mrs. Campbell told the officers, and whether there was any other evidence which would support a finding Plaintiff had committed domestic assault. Accordingly, defendant's motion will be denied with respect to Plaintiff's claim of unlawful arrest.

**3.      Excessive Force**

The Fourth Amendment protects an individual's right to be free from a police officer's use of excessive force. *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). A claim of excessive force turns on whether the officer's actions were objectively reasonable. *Id*. Additionally, the Sixth Circuit has held that

> [t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chamber, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (citations omitted).

The Supreme Court established four factors for courts to consider when evaluating an officer's use of force: (1) the severity of the crime at issue; (2) the immediate threat the suspect poses to the safety of the officer or others; (3) the suspect's resistance; and (4) the possibility of flight. *Id*. at 396. Additionally, the extent of a plaintiff's injury, though not crucial, is also considered in adjudicating excessive force claims. *Neague*, 258 F.3d at 508.

In the instant action, Plaintiff admits to repeatedly placing his hands in his pockets even though defendants Babaoglu and Clark had asked him not to do so. [Doc. 36, Attachment 2 at p. 4]. Plaintiff further admits that it was reasonable for the defendants to believe that Plaintiff might have had something in his pockets that he was trying to conceal.

[*Id*.]. However, there is a question of fact as to whether Plaintiff resisted defendants when they attempted to take control of the situation in the foyer, resulting in Plaintiff's hitting the wall and landing on the stairs. There is also a question of fact as to whether Plaintiff resisted the defendants as he was being taken to the patrol car, resulting in Plaintiff's head being slammed against the car. Given that there are genuine issues of material fact, defendant's motion will be denied with respect to the issue of excessive force.

**4.      Equal Protection**

To establish an equal protection claim under § 1983, Plaintiff must show that he was a member of a protected class and that he was intentionally and purposefully discriminated against because of his membership in that protected class. *Boger v. Wayne County*, 950 F.2d 316, 325 (6th Cir. 1991). Plaintiff has made absolutely no showing that he is a member of a protected class. Accordingly, defendant's motion will be granted with respect to Plaintiff's equal protection claim.

**5.      Qualified Immunity**

"Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known." *Thacker*, 328 F.3d at 259. The Sixth Circuit has held that qualified immunity involves a two-step inquiry:

> First the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation occurred. If

> the court finds a constitutional violation, it must then consider whether the violation involved "clearly established constitutional rights of which a reasonable person would have known."

*Id.* (citation omitted). "A right will be considered clearly established when the 'contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (citation omitted). Additionally, "[i]mmunity applies if reasonable officials could disagree as to whether the conduct violated the plaintiff's rights." *Id.* at 260 (citation omitted).

Defendants Babaoglu and Clark contend that they are entitled to qualified immunity with respect to Plaintiff's unlawful arrest and excessive force claims.[1] Plaintiff disagrees, claiming that the defendants violated clearly established constitutional rights, negating qualified immunity.

However, as noted above, there are a number of material questions of disputed fact with respect to the unlawful arrest and excessive force claims. The Sixth Circuit has held that "[w]here . . . the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability, and thus summary judgment should not be granted." *Griffith v. Coburn*, 473 F.3d 650, 656 (6th Cir. 2007) (citation omitted). Given the factual disputes in this case, including whether Plaintiff was

---

[1]Defendants also contend that they are entitled to qualified immunity with respect to Plaintiff's other claims, but as the Court found that no constitutional violation occurred with respect to Plaintiff's other claims, the Court need not reach the issue of qualified immunity as to those claims.

drunk, whether Plaintiff resisted the officers, how much force was used against Plaintiff in his home, whether Plaintiff's head was slammed into the patrol car, as well as the factual dispute over whether domestic assault had occurred, summary judgment is not appropriate.

## IV. Conclusion

For the reasons set forth herein, defendant Knox County's motion for summary judgment [Doc. 25] will be **GRANTED** and Plaintiff's § 1983 claims will be **DISMISSED with prejudice** with respect to defendant Knox County. Additionally, the motion for summary judgment of defendants Babaoglu and Clark [Doc. 28] will be **GRANTED in part**, to the extent that Plaintiff's § 1983 claims based upon unlawful entry and equal protection will be **DISMISSED with prejudice**, and **DENIED in part** with respect to Plaintiff's § 1983 claims based upon unlawful arrest and excessive force. Plaintiff's § 1983 claims of unlawful arrest and excessive force will proceed towards trial.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE